FARM CREDIT SERVICES OF
MID–AMERICA, Petitioner,

v.

INDIANA DEPARTMENT OF STATE
REVENUE, Respondent.

No. 45T10–9408–TA–00216.

Tax Court of Indiana.

March 12, 1997.

Thomas C. Borders, McDermott, Will &
Emery, Chicago, IL, for Petitioner.

Jeffrey A. Modisett, Attorney General of
Indiana, David A. Arthur, Deputy Attorney
General, Indianapolis, for Respondent.

FISHER, Judge.

This appeal arises out of the Department
of State Revenue's disallowance of a refund
of gross income and franchise taxes paid by
Farm Credit Services of Mid–America
("Mid–America"). Mid–America, an Agricul-
tural Credit Association, argues that it is
immune from these state taxes because it is a
federal instrumentality. This Court agrees.

### FACTS AND BACKGROUND

The Farm Credit System is a nationwide
network of cooperative, borrower-owned
banks and local lending associations provid-
ing affordable credit to farmers and ranch-
ers. 12 U.S.C.A. § 2001 (West 1989). The
network was designed to furnish farmers and
ranchers with a stable source of credit while
at the same time encouraging them to partic-
ipate in the "management, control, and own-
ership" of the system. *Id.* Petitioner Mid–
America is one of the hundreds of local lend-
ing associations chartered by the Farm
Credit Administration and operating in the
Farm Credit System. Pet'r Ex. 1.

Since its inception in 1916, the Farm Cred-
it System has undergone several stages of
development. Initially, the system consisted
of twelve Federal Land Banks, one for each
farm credit district, and was overseen by the
Federal Farm Loan Board. Federal Farm
Credit Loan Act of 1916, Pub.L. No. 158, 39
Stat. 360. It was the task of these banks to
provide farmers and ranchers with long-
term, real estate loans secured by mortgag-
es. The loans were made through local asso-
ciations, later known as Federal Land Bank
Associations ("FLBAs"). During the depres-
sion of the 1920's, Congress added a Federal
Intermediate Credit Bank to each district to

provide capital for short-term loans to farmers for their production and operation expenses. Agricultural Credit Act of 1923, Pub.L. No. 503, 42 Stat. 1454. In 1933, President Franklin D. Roosevelt replaced the Federal Farm Loan Board with the newly created Federal Credit Administration, Executive Order No. 6084, *reprinted in* 12 U.S.C.A. subch. V, pt. B, at 896–98 (West 1989), and Congress established Banks for Cooperatives to make loans to farmer marketing and purchasing cooperatives. Farm Credit Act of 1933, Pub.L. No. 75, 48 Stat. 257. Also in the 1933 Act, Congress established the precursors to local Production Credit Associations ("PCAs") to handle the short-term loans from the Federal Intermediate Credit Banks. These enactments were recodified in the Farm Credit Act of 1971. For a description of the history of the Farm Credit System, see the House Report on the Farm Credit Act of 1971, H. Rep. No. 593, 92d Cong., 1st Sess. (1971), *reprinted in* 1971 U.S.C.C.A.N.2091, 2096–99; the House and Senate Reports relating to the 1987 amendments, S.Rep. No. 230, 100th Cong., 1st Sess. 7–16 (1987) [hereinafter 1987 Senate Rep.]; H. Rep. No. 295(I), 100th Cong., 1st Sess. 53–59, 64–66 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2723, 2725–29 [hereinafter 1987 House Rep.].

This system functioned relatively well from the 1930s to the early 1980s. In the 1980s, however, worsening economic conditions threatened the stability of the system's lending institutions. In an effort to address the impending crisis, Congress enacted the Agricultural Credit Act of 1987, Pub.L. No. 100–233, 101 Stat. 1568. *See* 1987 Senate Rep., *supra*, at 14–22; 1987 House Rep., *supra*, at 53–58. Two of the provisions of that Act are especially relevant here. First, Congress mandated that each Federal Land Bank merge with the Federal Intermediate Credit Bank in its district to form a Farm Credit Bank. Pub.L. No. 100–233, § 410, 101 Stat. 1568, 1637, as amended, Pub.L. No. 100–399, § 402, 102 Stat. 995, 999, *reprinted in* 12

U.S.C.A. § 2011 note, at 743 (West 1989). Second, Congress authorized various voluntary mergers between and among the banks and associations of the system. 12 U.S.C.A. subch. VII (West 1989). One section of this subchapter provides that like and unlike associations within the same district may merge on approval of the Farm Credit Administrative Board, the relevant Farm Credit Bank, and the boards of directors and stockholders of the associations involved. 12 U.S.C.A. § 2279c–1 (West 1989).[1] The Farm Credit Administration refers to the resulting entity as an Agricultural Credit Association ("ACA"), 12 C.F.R. § 611.1040 (1996), and the statute provides that such an association "possesses all powers granted under [chapter 23] to the associations forming the merged association" and is "subject to all of the obligations imposed under [chapter 23] on the associations forming the merged association," 12 U.S.C.A. § 2279c1(b)(1).

Pursuant to subchapter VII, Mid–America was formed as the result of a merger of three FLBAs and one PCA in the fourth farm credit district. Pet'r Ex. 1. The Farm Credit Administration formally chartered Petitioner as a ACA in March 1989, stating that Mid–America "is an institution of the Farm Credit System and a federally chartered instrumentality." *Id.* Despite this pronouncement by the Farm Credit Administration, the Department imposed Indiana's gross income tax, Ind.Code Ann. § 6–2.1–2–2 (West 1989), on Mid–America for 1989, as well as the franchise tax, Ind.Code Ann. § 6–5.5–2–1 (West Supp.1990), for 1990 through 1992. Mid–America paid the taxes and filed amended returns requesting refunds on the grounds that, as a federal instrumentality, it is immune from these taxes. The Department denied the refunds, and Mid–America is now before this Court on a motion for summary judgment.

### STANDARD OF REVIEW

The Tax Court reviews final determinations by the Department *de novo* and is not

---

1. Some of the other sections of subchapter VII address the requirements for merging banks within a district, 12 U.S.C.A. § 2279a (West 1989), transferring lending authority from a bank to an association, 12 U.S.C.A. §§ 2279b (West 1989), merging similar banks across districts, 12 U.S.C.A. § 2279f (West 1989), and merging similar associations without regards to district boundaries, 12 U.S.C.A. § 2279f–1 (West 1989).

bound by the evidence raised or the issues presented at the administrative level. *Raintree Friends Housing, Inc. v. Department of State Revenue,* 667 N.E.2d 810, 813 (Ind. Tax Ct.1996).

A motion for summary judgment will be granted only when there is no genuine issue of material fact, and a party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C). "If no genuine issue of material fact exists, either the movant or the non-movant may be granted summary judgment." *Enclyclopaedia Britannica, Inc. v. State Bd. of Tax Comm'rs,* 663 N.E.2d 1230, 1232 (Ind. Tax Ct.1996).

### *ANALYSIS AND DISCUSSION*

■ The parties do not dispute the time-honored rule that the federal government and its instrumentalities are immune from state and local taxation absent express waiver by Congress. *See* Laurence H. Tribe, *American Constitutional Law* 514 (2d ed.1988); Paul J. Hartman, *Federal Limitations on State and Local Taxation* 289 (1981). This doctrine of federal tax immunity was first articulated by Chief Justice Marshall writing for a unanimous court in *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), in which the Supreme Court ruled that Maryland could not impose a stamp tax on the Bank of the United States. The high court explained that the states "have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *Id.* at 436. This, the Court said, was "the unavoidable consequence of that [federal] supremacy which the constitution has declared." *Id.* The question presented in this case is limited to whether Mid–America, as an ACA, is an instrumentality of the federal government.

The Department denies that Mid–America is a federal instrumentality because Congress did not expressly so provide. The Department points out that Congress explicitly made the other lending institutions of the Farm Credit System federal instrumentalities and granted them very specific immunities from state and local taxation.[2] In light of these pronouncements, the Department contends that "[t]he only logical implication" of Congress's failure similarly to designate ACAs as federal instrumentalities and to provide them with specific tax immunity is that Congress intended ACAs to be treated as private entities subject to state taxation. Resp't Br. at 5. The Court is not convinced by this argument.

**2.** The statute states, for example, that a PCA is "a Federally chartered instrumentality of the United States," 12 U.S.C.A. § 2071(a) (West 1989), and specifically outlines its immunity from state taxation. The statute provides:

Taxation. Each production credit association and its obligations are instrumentalities of the United States and as such any and all notes, debentures, and other obligations issued by such associations shall be exempt, both as to principal and interest, from all taxation (except surtaxes, estate, inheritance, and gift taxes) now or hereafter imposed by the United States or any State, territorial, or local taxing authority, except that interest on such obligations shall be subject to Federal income taxation in the hands of the holder.

12 U.S.C. § 2077 (West 1989). Similarly, an FLBA is designated as "a federally chartered instrumentality of the United States," 12 U.S.C. § 2091 (West 1989), and given particular immunities from state taxes. The relevant section reads:

Taxation. Each Federal land bank association and the capital, reserves, and surplus thereof, and the income derived therefrom, shall be exempt from Federal, State, municipal, and local taxation, except taxes on real estate held by a Federal land bank association to the same extent, according to its value, as other similar property held by other persons is taxed. The mortgages held by the Federal land bank associations and the notes, bonds, debentures, and other obligations issued by the associations shall be considered and held to be instrumentalities of the United States and, as such, they and the income therefrom shall be exempt from all Federal, State, municipal, and local taxation, other than Federal income tax liability of the holder thereof under the Public Debt Act of 1941 (31 U.S.C. 3124).

12 U.S.C. § 2098 (West 1989). Congress made similar provisions for both Federal Credit Banks and Banks for Cooperatives. 12 U.S.C.A. §§ 2011, 2023 (West 1989) (Farm Credit Banks); 12 U.S.C.A. §§ 2121, 2134 (West 1989) (Banks for Cooperatives). In addition, the National Bank for Cooperatives is declared a federal instrumentality, 12 U.S.C.A. § 2141 (West 1989), but there is no separate section discussing its tax immunity.

The Department invites the Court to reason from the instances in which Congress expressly discussed the tax status of farm credit lenders to its treatment of ACAs. As with any argument by analogy, the relative persuasiveness of the argument depends on the strength of the similarities between the analogue group (i.e., Farm Credit Banks, Banks for Cooperatives, PCAs, and FLBAs) and the primary subject (i.e., ACAs). Trudy Govier, *A Practical Study of Argument* 267–68 (3d ed.1992); *see also* Edward P.J. Corbett, *Classical Rhetoric for the Modern Student* 103–06 (3d ed.1990). In this case, the Department's argument fails because it ignores a fundamental difference between ACAs and the institutional lenders of the Farm Credit System. The structure of the farm credit statute reveals this difference.

The Farm Credit Act, appearing as chapter 23 of title 12 of the United States Code, is divided into seven subchapters: (I) Farm Credit Banks, (II) Farm Credit Associations (with part A relating to PCAs and part B relating to FLBAs), (III) Banks for Cooperatives, (IV) Provisions Applicable to Two or More Classes of Institutions of the System, (V) Farm Credit Administration Organization, (VI) Assistance to Farm Credit System, and (VII) Restructuring of System Institutions. Thus, the Act devotes a separate subchapter to each institutional lender in the system. Farm Credit Banks, Banks for Cooperatives, PCAs, and FLBAs are each created and defined in their own subchapter. It is in these subchapters that the instrumentality and tax immunity provisions appear. *See supra* note 2. Conspicuous by its absence is a separate subchapter for ACAs, or for that matter, a subchapter for Agricultural Credit Banks ("ACBs"). These merged banks and associations are discussed only in subchapter VII—Restructuring of System Institutions.

Subchapter VII contains the voluntary merger provisions for all farm credit institutions. It does not purport to create or define the basic institutions that make up the Farm Credit System. Rather, it outlines the procedures by which these basic institutions may consolidate their operations through mergers with each other in an effort to "reduce costs and increase efficiency." *Buckeye Prod. Credit Ass'n v. Farm Credit Admin.*, 997 F.2d 11, 13 (4th Cir.1993) (discussing purpose behind association mergers). The only mention of the functions and operations of the merged banks and associations is that they have the same powers and obligations as their constituent entities. 12 U.S.C.A. §§ 2279a–2(a) (banks), 2279c–1(b)(1) (associations). The only tax provision in this subchapter relates to the tax consequences surrounding the act of merger itself, not the consequences for the entities after they are merged.[3]

With this understanding of the structure of the Farm Credit Act, the inadequacy of the Department's argument becomes clear. The Department's analogy depends upon Farm Credit Banks, Banks for Cooperatives, PCAs, and FLBAs receiving substantially similar treatment to ACAs under the statute. Congress, however, differentiated in the subchapters of the Act between the basic, institutional players of the farm credit system and the entities that would result from the voluntary mergers between and among these basic institutions. The Department would have the Court read Congress's silence on the question of the taxation of ACAs (and ABAs) to mean that Congress intended to subject all voluntarily merged associations (and banks) to state and local taxation. Such an interpretation leads to the absurd conclusion that Congress wanted to protect farm credit institutions from state and local taxes, but that as soon as two or more such lenders could reduce costs or increase efficiency by merging, they should lose their status as federal instrumentalities. The far more likely inference from this silence is that Congress simply assumed that the merging of

**3.** Section 2279g provides:

No State or political subdivision thereof may treat the merger or consolidation of two or more institutions of the Farm Credit System under this subchapter or title IV of the Agricultural Credit Act of 1987 as resulting in a change of ownership of any property owned by any of such merging or consolidating institutions, for purposes of any law of such State or political subdivision providing for reassessment of property on the occurrence of a change of ownership or imposing a tax on the ownership or transfer of property.

12 U.S.C.A. § 2279g (West 1989).

two or more instrumentalities would produce an instrumentality.

■ This reading of the Act receives further support from the relationship between ACAs and the federal government. Where Congress does not expressly state that an institution is a federal instrumentality or provide express tax immunity, such immunity can be implied by the courts. *See* Tribe, *supra*, at 511–12; Hartman, *supra*, at 222. The United States Supreme Court has recognized, however, that "there is no simple test for ascertaining whether [the] institution is so closely related to governmental activity as to become a tax-immune instrumentality." *Department of Employment v. United States*, 385 U.S. 355, 358–59, 87 S.Ct. 464, 467, 17 L.Ed.2d 414 (1966). Rather, courts consider whether the institution performs an important government function and the degree to which the federal government supervises and regulates the institution. *See Department of Employment*, 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414; *United States v. Michigan*, 851 F.2d 803 (6th Cir.1988).

In *Department of Employment v. United States*, for instance, the Supreme Court held that the American National Red Cross was a federal instrumentality in part because it performed an important government purpose. 385 U.S. at 359–61, 87 S.Ct. at 467–68. The high court pointed out that, even though it was a private organization, the Red Cross was obligated by statute and executive order "to meet this Nation's commitments under various Geneva Conventions, to perform a wide variety of functions indispensable to the workings of our Armed Forces around the globe, and to assist the Federal Government in providing disaster assistance to the States in time of need." *Id.* at 359, 87 S.Ct. at 467. "[T]ime and time again," the Supreme Court explained, "both the President and the Congress have recognized and acted in reliance upon the Red Cross' status virtually as an arm of the Government." *Id.* at 359–60, 87 S.Ct. at 467.

The Supreme Court also highlighted the federal government's role in the creation and operation of the Red Cross. 385 U.S. at 359–61, 87 S.Ct. at 467–68. The Court pointed out that Congress chartered the Red Cross and that the President was responsible for appointing the organization's principal officers. *Id.* at 359, 87 S.Ct. at 467. The Court also emphasized that the Red Cross received "substantial material assistance" from the federal government and that the government closely supervised its activities, subjecting it to a regular audit by the defense department. *Id.* Finally, the Court concluded that even though Red Cross employees were not employees of the United States and its daily affairs were not directed by government officials, "the Red Cross is like other institutions—e.g., national banks—whose status as tax-immune instrumentalities of the United States is beyond dispute." *Id.* at 360, 87 S.Ct. at 467.

The Sixth Circuit Court of Appeals took a similar approach in *United States v. Michigan* when it was asked to determine whether federal credit unions were federal instrumentalities. 851 F.2d at 804. The Court explained: "The leading cases suggest that we examine the purpose for which federal credit unions were created, that we determine whether they continue to perform that function, and that we assess the federal government's control over and involvement with these organizations." *Id.* at 806. Applying these standards to the case before it, the Court of Appeals held that the credit unions were created to perform an important government function and that they were still performing that function. Specifically, the Court found that the credit unions were "mak[ing] credit available on liberal terms and at low rates of interest to middle-class Americans who, because they frequently lack adequate security, might otherwise have to turn to small loan financiers who [could] extort excessive interest rates in times of unexpected need." *Id.* The Court also emphasized that the credit unions were created by Congress for a limited government purpose and that they were supervised by a federal agency with the power to terminate their operations. *Id.* at 807. Based on these considerations, the Court of Appeals concluded that the credit unions were federal instru-

mentalities and immune from state taxation.[4]

Applying these standards to ACAs, this Court finds that they are instrumentalities of the federal government. First, ACAs perform an important government function. As has been discussed, ACAs have all the powers and obligations of the PCAs and FLBAs from which they are formed, 12 U.S.C.A. § 2279c–1(b)(1), enabling ACAs to provide short, intermediate, and long-term credit on reasonable terms to the nation's farmers, 12 U.S.C.A. §§ 2073, 2093 (West 1989) (discussing pre-merger powers and obligations of PCAs and FLBAs). *See Buckeye Prod. Credit Ass'n v. United States,* 792 F.Supp. 827, 829 (D.D.C.1990) (discussing powers of ACAs). That such a service constitutes an important government function has been recognized at least since the 1940s. In *Federal Land Bank of St. Paul v. Bismarck Lumber Co.,* the Supreme Court held that Congress could immunize Federal Land Banks from state sales taxes because the banks were " 'instrumentalities of the federal goverment [sic], engaged in the performance of an important governmental function.' " 314 U.S. 95, 102, 62 S.Ct. 1, 5, 86 L.Ed. 65 (1941) (quoting *Federal Land Bank of St. Louis v. Priddy,* 295 U.S. 229, 231, 55 S.Ct. 705, 706, 79 L.Ed. 1408 (1935)). The Supreme Court described the function of the banks as "mak[ing] possible the extension of credit on liberal terms to farm borrowers." *Id.*

Second, an ACA is subject to federal supervision and regulation from its creation through its termination. Congress authorized the creation of ACAs through the merger of PCAs and FLBAs with the provisos that all such mergers are approved by the Farm Credit Administration, 12 U.S.C.A. §§ 2279c–1(a), 2279e, and that the Farm Credit Administration charters the newly formed entities, 12 U.S.C.A. § 2279e. The

federal government also plays an intimate role in the activities of ACAs. The statute directs the Farm Credit Administration to formulate and issue regulations regarding "the manner in which the powers and obligations of the associations that form the merged association are consolidated and, to the extent necessary, reconciled in the merged association." 12 U.S.C.A. § 2279c–1(a)(2); 12 C.F.R. § 611.1122 (1996). The types of loans ACAs can make, the types of borrowers who can receive loans, and the geographic territories ACAs can serve are all regulated by the Farm Credit Administration. 12 C.F.R. §§ 613, 614 (1996); *see also* 12 U.S.C.A. § 2252 (West 1989) (outlining Farm Credit Administration's general powers and duties with respect to farm credit institutions). In addition, the Farm Credit Administration is empowered to modify or revoke an ACA's charter once granted. 12 U.S.C.A. §§ 2071, 2091, 2212, 2279e (West 1989); 12 C.F.R. § 611.1120 (1996). In fact, an ACA may not even terminate its own existence without complying with various procedural requirements and receiving approval from the Farm Credit Administration Board. 12 U.S.C.A. § 2279d (West 1989); 12 C.F.R. § 611,1200–1270 (1996). Thus, ACAs are subject to precisely the sort of cradle-to-grave regulation that typifies federal instrumentalities.

This Court finds that the statutory scheme for the Farm Credit System does not evidence an intent on the part of Congress that ACAs be treated as private entities for the purposes of state taxation. Moreover, the Court finds that ACAs have the attributes of federal instrumentalities in that they perform an important government function and are subject to extensive regulatory supervision by the federal government. Based on the foregoing, this Court holds that Mid–Amer-

---

**4.** In addition to considering the function and attributes of the credit unions, the Court of Appeals in *Michigan* also noted that Congress had expressly conferred tax immunity on the unions. 851 F.2d at 807. The Court inferred from the statutory immunity provision that Congress believed the credit unions were instrumentalities. *Id.* In fact, the Court explained that where tax immunity is express, courts normally need not determine whether the entity in question is a federal instrumentality. *Id.* at 805–06 n. 1 (cit-

ing *First Agricultural National Bank v. State Tax Commission,* 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968)). The Court found, however, that it was necessary to address the issue in *Michigan* because the status of the credit unions affected a statute of limitations defense raised by the state. *Id.* In the present case, Congress did not provide specific tax immunity for ACAs. Despite this difference between the cases, this Court finds the analysis in *Michigan* instructive.

ica, as an ACA, is a federal instrumentality and is immune from the state taxes at issue in this case.[5]

titled to a refund for the amounts of tax erroneously paid for the tax years 1989 through 1992.

### CONCLUSION

The Department's determination is RE-VERSED, and the Court holds that Mid–America is entitled to judgment as a matter of law and hereby GRANTS summary judgment in favor of MidAmerica and against the Department. Mid–America is, therefore, en-

**5.** The question presented and argued before this Court was limited to whether MidAmerica was a federal instrumentality. The parties agreed that if Petitioner was an instrumentality, a refund would be appropriate. In light of this posture, the Court need not examine the further question of the extent of the tax immunity afforded ACAs.