**INDIANA DEPARTMENT OF STATE REVENUE, Appellant,**

v.

**FARM CREDIT SERVICES OF MID–AMERICA, ACA, Appellee.**

No. 49S10–9908–TA–453.

Supreme Court of Indiana.

Sept. 1, 2000.

Karen Freeman–Wilson, Attorney General of Indiana, Jon Laramore, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellant.

Thomas C. Borders, Richard A. Hanson, Kevin J. Feeley, Theodore R. Bots, Chicago, Illinois, Marilee J. Springer, Indianapolis, Indiana, Attorneys for Appellee.

## ON PETITION FOR INTERLOCUTORY APPEAL

SHEPARD, Chief Justice.

Farm Credit Services of Mid–America (Mid–America), an Agricultural Credit Association, claims it is exempt from Indiana's Financial Institutions Tax under constitutional principles of intergovernmental tax immunity. We conclude it is only partially exempt.

### Facts and Procedural History

Mid–America is part of the Farm Credit System, a nation-wide network of cooperative, borrower-owned banks and lending institutions that were established to provide affordable credit to farmers and ranchers. 12 U.S.C.A. § 2001 (West 1989).[1]

The system includes twelve Farm Credit Banks (FCBs), located in each of twelve districts. Through local associations, these banks provide real estate loans secured by mortgages. The local associations include Federal Land Bank Associa-

---

1. It is declared to be the policy of the Congress, recognizing that a prosperous, productive agriculture is essential to a free nation and recognizing the growing need for credit in rural areas, that the farmer-owned cooperative Farm Credit System be designed to accomplish the objective of improving the income and well-being of American farmers and ranchers by furnishing sound, adequate, and constructive credit and closely related services to them, their cooperatives, and to selected farm-related businesses necessary for efficient farm operations.

12 U.S.C.A. § 2001(a) (West 1989).

tions (FLBAs), which provide long-term loans, and Production Credit Associations (PCAs), which provide short-term and intermediate loans.

Congress created the Farm Credit System in 1916 and has reformed it several times during the intervening decades. In the early 1980s, the system began to falter under unfavorable economic conditions that threatened the stability of its lending institutions. Congress responded by enacting the Agricultural Credit Act of 1987. The Act authorized voluntary mergers between PCAs and FLBAs in an effort to streamline the structure of the lending bodies. The institution resulting from such a merger is called an Agricultural Credit Association (ACA).

Mid–America was created in 1989 through the merger of two PCAs and two FLBAs. This case arose in March 1997, when Mid–America filed an amended tax return with the Indiana Department of Revenue requesting a refund of the Financial Institutions Tax[2] it had paid for the tax years 1993 and 1994. Mid–America asserted that as a federal instrumentality it was immune from state taxation. The Department denied Mid–America's claim. Mid–America appealed to the Indiana Tax Court, where it prevailed on summary judgment. *Farm Credit Serv. of Mid–America v. Department of State Revenue*, 705 N.E.2d 1089 (Ind. Tax Ct. 1999).[3]

### Early Tax Immunity Doctrine

The doctrine of intergovernmental tax immunity derives from *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), the landmark case holding that the State of Maryland could not impose a tax on the Bank of the United States. Chief

**2.** Ind.Code Ann. § 6–5.5–2–1(a) (West 2000).

**3.** Mid–America and the Department earlier litigated Mid–America's liability for the Indiana Gross Income Tax for 1989 and the Indiana Financial Institutions Tax for 1990 through 1992. *See Farm Credit Serv. of Mid–America v. Department of State Revenue*, 677 N.E.2d 645 (Ind. Tax Ct. 1997), *review denied.* In that case, the Department conceded that if

Justice Marshall's opinion for the Court relied both on the discriminatory nature of the tax and on general principles of federal supremacy. Specifically, Marshall determined that, because the Bank was a "federal instrument" used to carry out the government's powers, state taxation would unconstitutionally interfere with the exercise of these powers. *Id.* at 425–37. Marshall explained that the individual states:

> have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government.

*Id.* at 436.

This principle was applied broadly for many years thereafter to bar taxation by one sovereign on another, or even on the employees of another. *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989); *see also, e.g., Collector v. Day*, 78 U.S. (11 Wall.) 113, 20 L.Ed. 122 (1870) (invalidating federal income tax on salary of state judge); *Dobbins v. Comm'rs of Erie County*, 41 U.S. (16 Pet.) 435, 10 L.Ed. 1022 (1842) (invalidating state tax on a federal officer). In the late 1930s, however, the Court began to narrow its view of tax immunity. In *Graves v. New York ex rel. O'Keefe*, 306 U.S. 466, 59 S.Ct. 595, 83 L.Ed. 927 (1939), the Court overruled the *Dobbins-Day* line of cases and held that intergovernmental tax immunity bars only those taxes imposed directly on one sovereign by another, or that discriminate against the sovereign to which they apply. *Id.* at 481–87. In restraining the scope of tax immunity, the Court explained:

> Mid–America was found to be a federal instrumentality it was immune from taxation and entitled to a refund of taxes paid. The Tax Court determined that Mid–America was a federal instrumentality, and Mid–America thus prevailed. *Id.* at 651. Here, the Department concedes that Mid–America is a federal instrumentality, but asserts that this is not dispositive of state tax immunity.

[T]he implied immunity of one government and its agencies from taxation by the other should, as a principle of constitutional construction, be narrowly restricted. For the expansion of the immunity of the one government correspondingly curtails the sovereign power of the other to tax, and where that immunity is invoked by the private citizen it tends to operate for his benefit at the expense of the taxing government and without corresponding benefit to the government in whose name the immunity is claimed.

*Id.* at 483.

Over the intervening years, the doctrine of intergovernmental tax immunity has become, in the Court's words, "a 'much litigated and often confused field,' one that has been marked from the beginning by inconsistent decisions and excessively delicate distinctions." *United States v. New Mexico,* 455 U.S. 720, 730, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982) (internal citations omitted).

Here, both parties agree that ACAs are "federal instrumentalities", but disagree about the tax implications of this status.

Both parties urge distinct views of tax immunity. Mid–America argues that federal instrumentalities are immune from state taxation unless Congress expressly waives such immunity, while the Department argues that federal instrumentalities are subject to state taxation unless Congress expressly exempts the instrumentality from taxation.

### The Department's View

In asserting that ACAs are subject to state taxation absent a congressional statement otherwise, the Department directs us to *Arkansas v. Farm Credit Serv. of Cent. Arkansas,* 520 U.S. 821, 117 S.Ct. 1776, 138 L.Ed.2d 34 (1997). In that case, four PCAs brought suit in U.S. District Court claiming an exemption from Arkansas sales and income taxes. The District Court granted the PCAs' motion for summary judgment, and the Court of Appeals for the Eighth Circuit affirmed. *Farm Credit Serv. of Cent. Arkansas v. Arkansas,* 76 F.3d 961 (8th Cir.1996).

The Supreme Court reversed on jurisdictional grounds, holding that, under the Tax Injunction Act, 28 U.S.C. § 1341, PCAs cannot sue in federal court for an injunction against state taxation unless the United States is a co-plaintiff. *Arkansas v. Farm Credit,* 520 U.S. at 831–32, 117 S.Ct. 1776. In so holding, the Court considered the long-standing power of the federal government to sue to protect itself or its instrumentalities from state taxation. The Court ultimately determined that, although PCAs are congressionally designated federal instrumentalities, this designation "does not in and of itself entitle an entity to the same exemption the United States has under the Tax Injunction Act." *Id.* at 832, 117 S.Ct. 1776.[4]

The Department urges us to rely on *Arkansas v. Farm Credit* for the proposition that status as a federal instrumentality does not necessarily confer upon an entity the same rights and privileges en-

**4.** In representing the United States as Amicus Curiae, the Solicitor General took the position that PCAs are subject to state taxation. In so asserting, he stated:

It would be particularly implausible to read [12 U.S.C.] Section 2077 so as to ascribe to Congress an intent to grant a production credit association a comprehensive immunity from taxation without regard to whether the federal government owned stock in it – an immunity that the associations never have enjoyed.

(App. to Appellant's Br., Br. for the United States as Amicus Curiae, at 16.)

Conversely, in *M'Culloch v. Maryland,* the Attorney General of the United States argued that the Bank of the United States was immune from state taxation, stating:

[T]he bank, as ordained by Congress, is an instrument to carry into execution its specified powers; and in order to enable this instrument to operate effectually, it must be under the direction of a single head. It cannot be interfered with, or controlled in any manner, by the states, ...

*M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) at 361.

joyed by the United States itself. Further, it directs us to the Court's description of PCAs:

> Whatever may be the rule under the Tax Injunction Act where a federal agency or body with substantial regulatory authority brings suit, PCA's [sic] are not entities of that description. PCA's are not granted the right to exercise government regulatory authority but rather serve specific commercial and economic purposes long associated with various corporations chartered by the United States.
>
> . . . .
>
> The PCAs' business is making commercial loans, and all their stock is owned by private entities. Their interests are not coterminous with those of the Government any more than most commercial interests. Despite their formal and undoubted designation as instrumentalities of the United States, and despite their entitlement to those tax immunities accorded by the explicit statutory mandate, ... that instrumentality status does not in and of itself entitle an entity to the same exemption the United States has under the Tax Injunction Act.

*Id.* at 831–32.

### Mid–America's View

The decision in *Arkansas v. Farm Credit,* of course, meant that only state supreme courts and the U.S. Supreme Court possess jurisdiction to decide whether PCAs are exempt from state taxation, and Mid–America directs our attention to some cases subsequently decided by other state high courts.

In *Arkansas v. Farm Credit Serv. of Cent. Arkansas,* 338 Ark. 322, 994 S.W.2d 453 (1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1530, 146 L.Ed.2d 345 (2000), the Arkansas Supreme Court held that PCAs are exempt from state sales and income taxes.[5] In so holding, the court reasoned that federal instrumentalities are immune from state taxation unless Congress expressly waives the immunity. *Id.* at 455. This reasoning was based on the court's interpretation of *M'Culloch* and its progeny, including the 1997 decision of the Indiana Tax Court. *See id.*

Similarly, in *Production Credit Ass'n v. Director of Revenue,* 10 S.W.3d 142 (Mo. 2000) (en banc), *cert. granted in part,* —— U.S. ——, 120 S.Ct. 2716, 147 L.Ed.2d 981 (2000), the Missouri Supreme Court concluded that PCAs were immune from Missouri state income taxes. The court reasoned that entities designated as "federal instrumentalities" are immune unless Congress explicitly waives immunity. The Missouri court examined the current version of the federal statute governing PCAs, noted it was silent on the matter of taxation, and concluded its inquiry, thus holding against the state. *Id.* at 143.[6]

While the cases offered by Mid–America and the Department provide an excellent background into our inquiry, we note that none of the cases are directly on point as all of the cited cases deal with PCAs rather than ACAs. While this difference is not dispositive, for reasons that will become apparent, these cases offer a view of tax immunity doctrine that is no longer reflected in recent Supreme Court decisions.

### Current Tax Immunity Doctrine

Mid–America cites *United States v. County of Allegheny,* 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944),[7] and sever-

---

**5.** The PCAs involved were the same four PCAs in *Arkansas v. Farm Credit,* 520 U.S. 821, 117 S.Ct. 1776, 138 L.Ed.2d 34. After the Supreme Court reversed on jurisdictional grounds, the litigants found their way to the courts of Arkansas.

**6.** This is roughly how the Louisiana Court of Appeals handled the same question. *North-*

*west Louisiana Production Credit Ass'n v. Louisiana,* 746 So.2d 280 (La.Ct.App.1999).

**7.** *United States v. County of Allegheny* was effectively overruled in 1958. *United States v. City of Detroit,* 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958); *United States v. County of Fresno,* 429 U.S. 452, 97 S.Ct. 699, 50 L.Ed.2d 683 (1977).

al federal circuit decisions for the proposition that, where Congress is silent, state tax immunity of federal instrumentalities is implied. (Appellee's Br. at 6–7.) More recent Supreme Court cases suggest, however, that in determining tax status, a court must examine the nature of the instrumentality, and the activity being taxed.

The 1982 case *United States v. New Mexico*, 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580, addressed whether government contractors are immune from state taxation. In deciding that they are not, the Court provided an historical overview of tax immunity law and then said:

> We have concluded that the confusing nature of our precedents counsels a return to the underlying constitutional principle. The one constant here, of course, is simple enough to express: a State may not, consistent with the Supremacy Clause, ... lay a tax "directly upon the United States."
>
> . . . .
>
> What the Court's cases leave room for, ... is the conclusion that tax immunity is appropriate in only one circumstance: when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned. This view, we believe, comports with the principal purpose of the immunity doctrine, that of forestalling "clashing sovereignty," by preventing the States from laying demands directly on the Federal Government.

*Id.* at 733–35, 102 S.Ct. 1373 (citations omitted).

■ Similarly, in *California State Bd. of Equalization v. Sierra Summit, Inc.*, 490 U.S. 844, 109 S.Ct. 2228, 104 L.Ed.2d 910 (1989), the Court held that the doctrine of intergovernmental tax immunity does not bar the imposition of a state sales or use tax on a bankruptcy liquidation sale. In so holding, the Court said " '[a] court must proceed carefully when asked to recognize an exemption from state taxation that Congress has not clearly expressed,' " *Id.* at 851–52, 109 S.Ct. 2228 (quoting *Rockford Life Ins. Co. v. Illinois Dep't of Revenue*, 482 U.S. 182, 191, 107 S.Ct. 2312, 96 L.Ed.2d 152 (1987)), and reiterated that "[a]bsolute tax immunity is appropriate only when the tax is on the United States itself 'or an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, ...' " *Id.* at 849, 109 S.Ct. 2228 (quoting *New Mexico*, 455 U.S. at 735, 102 S.Ct. 1373); *see also United States v. California*, 507 U.S. 746, 753, 113 S.Ct. 1784, 123 L.Ed.2d 528 (1993) (quoting *New Mexico* ); *South Carolina v. Baker*, 485 U.S. 505, 523–24, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988) (quoting *New Mexico* ).

■ We cannot read these cases and hop directly to the conclusion that anything labeled a federal instrumentality automatically possesses immunity from state taxation. The designation "federal instrumentality" certainly carries with it a strong possibility of such immunity, but the inquiry cannot simply end there.

After all, the last century was awash in Congressional enactments creating scores of commissions and corporations to carry out programs that the national legislature deemed important federal missions. From the Red Cross and the Boy Scouts to Amtrak and Comsat, these entities have been called by various names: federal instrumentalities, federal corporations, and government-sponsored enterprises, to mention a few.

Perusal of the field rapidly demonstrates that the name Congress chooses to give (or even not give) a particular entity does not by itself determine whether the entity is "an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities." *New Mexico*, 455 U.S. at 735, 102 S.Ct. 1373.

The statute creating the Red Cross, for example, says nothing about tax immunity and describes the corporation simply as "a body corporate and politic in the District of Columbia."[8] The Red Cross nevertheless has been deemed part of the Government for tax immunity purposes because of its close connection to federal departments and because the President appoints the board.[9] The Boy Scouts were created by Congress as a "corporation under the laws of the District of Columbia" in a statute that says nothing about tax immunity,[10] and the Scouts appear exempt for reasons unrelated to sovereign immunity. Comsat, formally the Communications Satellite Corporation, has a board chosen by its private shareholders, who have provided its capital; in creating Comsat, Congress declared it "will not be an agency or establishment of the United States Government."[11]

Such disavowals by Congress, however, do not bring constitutional inquiries to a close. The National Railroad Passenger Corporation, created by Congress as "a for profit corporation",[12] recently cited a similar provision in the statute ("not an agency")[13] to assert that it was not the government. Though the case arose under rather different circumstances than the ones we examine today, the Court spoke rather broadly about Amtrak's contention that the language of the statute settled the matter: "[I]t is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions." *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 392, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995). On matters of such gravity, labels do not account for much. As the Court said in considering the finances of the Reconstruction Finance Corporation: "That the Congress chose to call it a corporation does not alter its characteristics so as to make it something other than what it actually is." *Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536, 539, 66 S.Ct. 729, 90 L.Ed. 835 (1946).

We thus proceed to examine what Mid–America "actually is."

### Agricultural Credit Associations

As we mentioned above, ACAs such as Mid–America are entities created by merging FLBAs and PCAs.

■ FLBAs are federally chartered instrumentalities of the United States, offering long-term loans to farmers and farm-related businesses for land and other capital purchases. 12 U.S.C.A. § 2091 (West 1989); H.R.Rep. No. 100–295(I), at 55 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2723, 2727.

Since their inception, FLBAs have enjoyed immunity from state taxation pursuant to the following specific exemption enacted by Congress:

**8.** 36 U.S.C.A. § 1 (West 1988).

**9.** *Department of Employment v. United States,* 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966).

**10.** 36 U.S.C.A. § 24 (West 1988).

**11.** 47 U.S.C.A. § 731 (West Supp.2000). Comsat bears some resemblance to the venture launched by Congress during an earlier technological revolution: the Union Pacific Railroad. Congress created the corporation and the President appointed two members of the board. Act of July 1, 1862, § 1, 12 Stat. 491. Though Congress was silent on the question of tax immunity, we think it unlikely that the Union Pacific was ever regarded as exempt.

**12.** 45 U.S.C.A. § 541 (West 1987) (repealed 1994).

**13.** In establishing the Amtrak corporation, Congress provided:

The Corporation shall be operated and managed as a for profit corporation, the purpose of which shall be to provide intercity and commuter rail passenger service, .... *The Corporation will not be an agency or establishment of the United States Government.*
*Id.* (emphasis added).

> Each Federal land bank association and the capital, reserves, and surplus thereof, and the income derived therefrom, shall be exempt from Federal, State, municipal, and local taxation, except taxes on real estate held by a Federal land bank association. . . .

12 U.S.C.A. § 2098 (West 1989).

PCAs are also "[f]ederally chartered instrumentalit[ies] of the United States"; they are privately-owned, corporate financial institutions organized by ten or more farmers to provide short-term and intermediate loans to farmers. 12 U.S.C.A. § 2071, 2075 (West 1989). These loans are intended to cover seasonal operating expenses, land improvement, and purchases of farm equipment, livestock and buildings. H.R.Rep. No. 100–295(I), *supra*, at 55.

Unlike FLBAs, PCAs possess limited express tax immunity. First created by the Farm Credit Act of 1933, PCAs were initially funded by government loans, and were afforded immunity from state taxation as long as they were publicly-owned. The statute providing for this exemption, which remained substantially unchanged until 1985, read:

> Each production credit association and its obligations are instrumentalities of the United States and as such any and all notes, debentures, and other obligations issued by [PCAs] shall be exempt, both as to principal and interest from all taxation . . . imposed by the United States or any State, territorial, or local taxing authority. [PCAs], their property, their franchises, capital, reserves, surplus, and other funds, and their income shall be exempt from all taxation now or hereafter imposed by the United States or by any State, territorial, or local taxing authority; . . . except that any real and tangible personal property . . . shall be subject to Federal, State, territorial, and local taxation to the same extent as similar property is taxed. *The exemption provided in the preceding sentence shall apply only for any year or part thereof in which stock in the production credit associations is held by the Governor*[14] *of the Farm Credit Association.*

Farm Credit Act of 1971, Pub.L. No. 92–181, § 2.17, 85 Stat. 583, 602 (1972) (emphasis supplied).

During the 1950s and 1960s, stock held by the Farm Credit Association was gradually retired. By 1968, PCAs were entirely owned by their borrower-members, as they continue to be. *See* H.R.Rep. No. 92–593 (1971), *reprinted in* 1971 U.S.C.C.A.N. 2091, 2098; *Smith v. Russellville Prod. Credit Ass'n*, 777 F.2d 1544, 1550 (11th Cir.1985).

In 1985, Congress deleted the express tax exemption that had been granted to publicly-owned PCAs. What remains in the current statute is a partial exemption:

> Each production credit association and its obligations are instrumentalities of the United States and as such any and all notes, debentures, and other obligations issued by such associations shall be exempt, both as to principal and interest, from all taxation . . . imposed by the United States or any State, territorial, or local taxing authority, . . .

12 U.S.C.A. § 2077 (West 1989).[15]

Both PCAs and FLBAs are privately owned and controlled. They are, however, considered "[g]overnment-sponsored entities" and have a preferred place in the

---

**14.** Before 1985, the Chairman of the Farm Credit Association was called the "Governor." 12 U.S.C.A. § 2241 (West 1989), Historical and Statutory Notes, Interim Implementation of 1985 Amendment, Pub.L. No. 99–205, § 402.

**15.** By the time this amendment was adopted, there were no publicly-owned PCAs entitled to the exemption. *See Farm Credit Serv. of Cent. Arkansas v. Arkansas*, 76 F.3d at 967 (Loken, J., dissenting). Thus, Mid–America concludes that PCAs were subject to taxation before 1985, and not afterwards, inasmuch as taxation was no longer "expressly authorized." (*See* Appellee's Br. at 14.)

nation's money markets, although debt issuances are not guaranteed by the United States. H.R.Rep. No. 100–295(I), *supra,* at 55. The associations are governed by boards of directors elected from and by the stockholders. *Id.*[16]

The power to merge FLBAs and PCAs is found in 12 U.S.C. § 2279c–1. While this statute authorizes such mergers, it does not establish what the tax implications are for the resulting ACA. The statute provides only that a merged association shall:

> (A) possess all powers granted under this chapter to the associations forming the merged association; and

> (B) be subject to all of the obligations imposed under this chapter on the associations forming the merged association.

12 U.S.C.A. § 2279c–1(b)(1) (West 1989).

As discussed above, Congress enacted the Agricultural Credit Act of 1987 in response to an agricultural depression that began in the early 1980s. The 1987 Act was passed, in essence, to salvage the Farm Credit System. H.R.Rep. No. 100–295(I), *supra.* Mergers between Farm Credit entities were authorized in an effort to increase efficiency within the system while maintaining control by the farmer-shareholders. Such evidence of Congressional intent as we can find emphasizes not the close connection of the United States to lenders but the close connection of the local owners. In recommending legislation to allow such mergers, the House Committee on Agriculture said:

> The Federal Land Bank System has served as the primary lender of long-term agricultural credit since its inception in 1916. Competition from other institutions has existed but the Farm Credit System's ability to obtain funds in capital markets on Wall Street (known as agency status) has allowed

the System to offer lower interest rates to farmers and ranchers.

> . . . .

> The loan portfolio of the Farm Credit System has shrunk considerably in the last five years . . . . [T]he Farm Credit Systems' [sic] seventy year-old structure must be reorganized in order that the System compete in an agricultural lending environment that is going through its biggest changes since farmers began borrowing money . . . .

> Realizing the structure was quickly becoming outmoded and incapable of maintaining a competitive position, the Committee felt the Farm Credit System must make certain changes . . . .

> Because the concept of a member-owned cooperative is appreciated to the highest degree at the local level, the fairest and most effective approach in dealing with the problem would be to down-size the middle layer (district banks) of the bureaucracy. This approach would allow the stockholders to continue control production credit associations and Federal land bank associations while accruing significant savings on borrower interest costs, especially in years to come.

H.R.Rep. No. 100–295(I), *supra,* at 65–66.

Legislative and regulatory history also suggests that institutions created by mergers were deemed to retain the characteristics of the former entities. The statute governing mergers of Farm Credit entities states: "The Farm Credit Administration shall issue regulations that establish the manner in which the powers and obligations of the associations that form the merged association are consolidated and, to the extent necessary, reconciled in the merged association." 12 U.S.C.A. § 2279c–1(b)(2) (West 1989).

The FCA regulations define an agricultural credit association as an "association[ ]

---

**16.** As a condition of obtaining a loan, borrowers are required to purchase stock in the association in an amount equal to a set percentage of the face amount of the loan.

H.R.Rep. No. 92–593, *supra,* 1971 U.S.C.C.A.N. at 2097; 12 C.F.R. § 614.4335 (2000).

created by the merger of one or more Federal land bank associations or Federal land credit associations and one or more production credit associations ..." Farm Credit Administration Definition, 12 C.F.R. § 619.9015 (2000). The regulations also define a merger as the "[c]ombining of one or more organizational entities into another similar entity," or "the combination of one or more associations into a continuing constituent association, which retains its charter and bylaws (except as amended to effect the merger proposal)." *Id.* §§ 619.9210, 611.1122 (2000).[17]

Thus, a merged association, like an ACA, is not considered a new organizational entity, but rather a combination of the two previous entities. And although PCAs and FLBAs are merged to streamline the Farm Credit System, the resulting ACA continues to provide the same services to the same constituents as the original entities.

Mid–America's own structure reflects this definition of "merger." With offices principally located in Louisville, Kentucky, Mid–America's territory also includes Indiana, Tennessee, and parts of Kentucky and Ohio. Farm Credit Service of Mid–America, ACA, *1999 Annual Report* (2000) [hereinafter Annual Report]. Mid–America consists of an ACA parent company,

and two wholly-owned subsidiaries: Farm Credit Services of Mid–America, FLCA (Federal Land Credit Association),[18] and Farm Credit Services of Mid–America, PCA. The FLCA makes secured long-term agricultural real estate and rural home mortgage loans while the PCA makes short and intermediate-term loans. *Id.*[19] The entity thus performs two distinct and seemingly autonomous functions: long-term mortgage lending through an FLCA and short-term lending through a PCA.

Congress has been very clear in its decision that long-term lending institutions, such as FLBAs and FLCAs, should enjoy immunity from state taxation. Most writers on the general principles of intergovernmental tax immunity take for granted that Congress possesses the power to confer immunity. Thus, the FLCA or long-term mortgage lending portion of Mid–America's operations should not be factored into a calculation of taxes owed by Mid–America under Indiana's Financial Institution Tax.

With respect to the PCA or short-term lending portion of Mid–America's operations, we reach a different conclusion. Since 1985, Congress has afforded only partial tax immunity to PCAs. Before

**17.** Conversely, a consolidation is defined as the "[c]reation of one new organizational entity from two or more existing entities or parts thereof." 12 C.F.R. § 619.9110.

**18.** A federal land credit association (FLCA) is an entity that has received a transfer of direct long-term lending authority from an FLBA. An FLCA is authorized to make real estate mortgage loans. Farm Credit Administration Definitions, 12 C.F.R. §§ 614.4030, 619.9155 (2000); 12 U.S.C.A. § 2279b (West 1989).

**19.** Mid–America's Annual Report states:

On December 1, 1999, the Association restructured its operations. Instead of the single ACA entity, the Association is now composed of an ACA parent company with two wholly-owned subsidiaries. The subsidiaries are chartered as a PCA and an FLCA. The restructuring preserves certain advantages of the ACA structure while clarifying the tax exemption of the mortgage

operations by conducting those operations in a separate subsidiary chartered as an FLCA.

*Annual Report, supra,* Management's Discussion and Analysis, at 2.

As discussed in Note 1, the Association moved to a parent-subsidiaries structure effective December 1, 1999. In a case of a completed restructuring using this subsidiary pattern by another ACA, the IRS issued a private letter ruling that the income of a new FLCA subsidiary is, under the Farm Credit Act, exempt from taxation.

*Annual Report, supra,* Notes to Consolidated Financial Statements, at 5.

Although technical advice memoranda issued by the IRS may not be used or cited as precedent, we find the aforementioned helpful in uncovering Mid–America's understanding of the tax implications of its bifurcated structure.

<br>

that, it protected PCAs from state taxation only while they were publicly-owned. PCAs are now entirely privately-owned and controlled. They obtain their funds in the private market and disperse them without any participation by the United States. Their farmer/shareholders choose the managers of the enterprise. In light of these characteristics of the entity and Congress's removal of the exemption, we cannot conclude that a PCA is "an agency or instrumentality so closely connected to the Government" so as to afford it an exemption from state taxation. As the Supreme Court said: "Their interests are not coterminous with those of the Government any more than most commercial interests." *Arkansas v. Farm Credit*, 520 U.S. at 831, 117 S.Ct. 1776.

The Indiana Financial Institutions Tax is measured by calculating the taxpayer's adjusted gross income, or apportioned income, for the privilege of transacting the business of a financial institution in Indiana. Ind.Code Ann. § 6–5.5–2–1 (West 2000). Although Mid–America only formally divided its operations into two subsidiaries in 1999, we presume it could separate and calculate the gross income derived from long-term mortgage loans from that derived from short-term loans for the tax years 1993 and 1994.

Thus, the Department is entitled to tax that part of Mid–America's gross income derived from Mid–America's short-term PCA operations, but not the income generated by long-term FLBA lending, which enjoys immunity from state taxation under the Farm Credit Act.

### Conclusion

We thereby reverse and remand to the Indiana Tax Court for proceedings to determine the tax due on Mid–America's PCA operations.

DICKSON and RUCKER, JJ., concur.

BOEHM, J., dissents with separate opinion in which SULLIVAN, J., joins.

BOEHM, Justice, dissenting.

I agree in large part with the majority's account of tax immunity doctrine past and present. And the majority's result is inviting. As the majority explains, PCAs enjoy only limited immunity from state and local taxation, but FLBAs enjoy complete immunity. One can imagine that an ACA, as the product of a merger of these two, might enjoy tax immunity for those activities traditionally conducted by FLBAs, but not for those historically performed by PCAs. Nonetheless, it seems clear to me that Mid–America, as an ACA, is a new entity, albeit one formed by the merger of a PCA and an FLBA. Neither party in this lawsuit contends that ACAs enjoy partial immunity from state taxation and I cannot find a statutory basis for the majority's result that splits Mid–America's tax liability based on long-term versus short-term lending. Forced to choose between the poles of complete taxability and total immunity for ACAs, I believe taxability is more consistent with the statutory pattern that gives rise to this question of federal law. Moreover, it seems to me that the majority's Solomonic solution will lead to endless disputes as to the character of various transactions as the creative juices of accountants, tax lawyers, and revenuers begin to flow.

The majority points out that in evaluating a claim of immunity current Supreme Court law requires us to "examine the nature of the instrumentality, and the activity being taxed." *Indiana Dep't of State Revenue v. Farm Credit Servs.*, 734 N.E.2d 551, 556 (Ind.2000). I agree with that standard but disagree as to the result it produces. An ACA is a privately owned entity operated for the benefit of private interests. I believe this strongly suggests a taxable entity. And the nature of an ACA's activities—financing farmland acquisitions and short-term borrowings—points in the same direction. These activities are conducted by a myriad of other privately owned taxable entities. Thus, both the nature of the entity and its activi-

ties, in the interest of competitive fairness, suggest taxability, not immunity. It is of course true that all of these activities were once immune from state taxation if conducted by a PCA or an FLBA. But that was by reason of the nature of the entity and/or by express congressional mandate, not by reason of the activity itself. I also think it is significant that we are interpreting a relatively recently enacted statute. It seems improbable to me that immunity was intended by omission in this era of legislative moves toward privatization and reliance on market forces.

Nor can I find support for immunity in the express language of the statute authorizing the merger of PCAs and FLBAs into ACAs. Congress has been deafeningly silent on the issue of state taxation of ACAs. Citing *United States v. Allegheny County*, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944), Mid–America claims that in the absence of an expression of congressional opinion it is entitled to immunity as a "federal instrumentality." The Department urges that, even though some earlier cases found tax immunity despite congressional silence, the current statutes governing the Farm Credit System expressly address this subject and confer varying degrees of immunity on the several farm credit entities. *See* 12 U.S.C. §§ 2001 to 2279 (1994). The Department maintains that in the absence of an explicit conferral of immunity, we should conclude there is none.

As the Supreme Court held, status as a federal instrumentality does not confer automatic immunity under the Tax Injunction Act. *See Arkansas v. Farm Credit Servs.*, 520 U.S. 821, 831–32, 117 S.Ct. 1776, 138 L.Ed.2d 34 (1997). And, as the majority notes, recent Supreme Court cases make clear that this status carries no talismanic defense to a state revenue agent. *See Farm Credit Servs.*, 734 N.E.2d at 556–57. These cited statutory provisions produce, at best, a standoff, and no other statutory language seems to me

to bear on this issue. The majority points out that the statute specifies that the merged association will "possess all powers granted under this chapter to the associations forming the merged association" and "be subject to all of the obligations imposed under this chapter on the associations forming the merged association." 12 U.S.C. § 2279c–1. I find neither provision relevant here. It is an odd if not distorted usage to speak of a tax immunity as either a "power" or an "obligation" of a corporate entity. One thinks of the former as referring to the activities and actions the entity may undertake, and the latter as referring to the debts, contractual and other acquired obligations, of the predecessor. Neither, in conventional usage, refers to a status such as immunity from taxes. And, as the Fourteenth Amendment witnesses, the terms to confer an immunity have long been familiar to legislators and even the drafters of constitutions, but are glaringly absent here.

In sum, in today's world, given the trends identified by the majority against implied immunity, it seems more probable to me that if Congress had intended to provide immunity for some activities of an ACA but not for others, it would have said so explicitly. Congress did something like this with respect to PCAs, whose obligations are exempt from state taxation in the hands of their holders, but whose activities are subject to state taxation. *See id.* § 2077. We thus have a statutory scheme in which two farm credit entities are explicitly exempted from all state taxation, two are explicitly partially exempt from taxation, and one—the ACA—enjoys no explicit exemptions. *See id.* §§ 2023, 2077, 2098, 2134. As the Supreme Court put it, "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Rodriguez v. United States*, 480 U.S. 522, 525, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (per

curiam) (quoting *Russello v. United States,* 464 U.S. 16, 22–23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)). If Congress had intended to exempt the newly created ACAs from state and local taxation, I believe it would have said so.

All of the foregoing applies to the tax years before 1999. Mid–America, whether for tax or other reasons, has now apparently dropped its operations into two wholly owned subsidiaries. One of these is a Federal Land Credit Association and, therefore, like an FLBA, is exempt by virtue of its status. The other is a taxable PCA. How these tax statuses affect a consolidated return, if one is required or electable, is a matter for another day. For now, the issue is solely Mid–America's pre-reorganization tax status, which I would conclude is that of a fully taxable entity like any other private enterprise. Accordingly, I respectfully dissent.

SULLIVAN, J., concurs.