PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-3057
_____

In Re: LTC HOLDINGS, INC., et al.,
Debtors

ALFRED T. GIULIANO, Chapter 7 Trustee for the
Consolidated Estate
of LTC Holdings, Inc., et al.

v.

INSURANCE COMPANY OF THE STATE OF
PENNSYLVANIA,
Appellant

v.

ALFRED T. GIULIANO, Chapter 7 Trustee;
BMO HARRIS BANK, N.A., Counterclaim Defendants
_____

On Appeal from the United States District Court
for the District of Delaware

District Court No. 1-19-cv-00327
District Judge: The Honorable Maryellen Noreika

_____

Argued June 23, 2021

Before: SMITH, *Chief Judge*, MATEY, and FISHER, *Circuit Judges*

(Filed: August 18, 2021)


Andrew S. Kent          [ARGUED]
Chiesa Shahinian & Giantomasi
One Boland Drive
West Orange, NJ 07052
          *Counsel for Appellant*

David T.B. Audley
Michael T. Benz          [ARGUED]
Chapman & Cutler
111 West Monroe Street
18th Floor
Chicago, IL 60603

Richard M. Beck
Glenn A. Wiener
Klehr Harrison Harvey Barnzburg
1835 Market Street

2

Suite 1400
Philadelphia, PA 19103
  *Counsel for Appellee*


_____

OPINION OF THE COURT
_____


SMITH, *Chief Judge*.

Lakeshore Toltest Company ("LTC") and its affiliates (collectively, the "Debtors") entered into construction contracts with the United States. The Appellant, Insurance Company of the State of Pennsylvania ("ICSP"), provided performance and payment bonds guaranteeing that the Debtors would complete those contracts. When the Debtors defaulted on the contract at issue here, ICSP stepped in to make sure that the work was completed. As a result, ICSP claims that it is subrogated to the United States' rights to set off a tax refund (owed to one or more of the Debtors) against the losses that ICSP covered. However, to settle various claims in the Debtors' Chapter 7 bankruptcy proceedings, the United States and the Trustee agreed that the United States would waive its setoff rights.

ICSP's claim to set off the tax refund raises three issues regarding a performance bond surety's subrogation rights under Section 509 of the Bankruptcy Code, 11 U.S.C. § 509. We conclude, first, that the United States had not yet been "paid in full," within the meaning of Section 509(c), when the Bankruptcy Court approved the settlement. So, pursuant to Section 509(c), ICSP's subrogation rights were subordinate to the remaining and superior claims of the United States at the time of the settlement. Second, the United States was entitled to waive its setoff rights in order to settle its remaining and superior claims. Third, the United States' waiver of its setoff rights extinguished ICSP's ability to be subrogated to those rights. Therefore, for the reasons discussed below, we will affirm the order of the District Court affirming the Bankruptcy Court's ruling that ICSP is not entitled to the tax refund.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

### A.     The Parties

Before they filed for bankruptcy, the Debtors provided general contracting services for large construction projects, including many projects for departments of the United States Government. To enter into contracts with the United States, contractors are generally required to post both a performance bond and a payment bond signed by the contractor and a qualified surety (such as ICSP). *See generally* 40 U.S.C. § 3131 *et seq.* (the "Miller Act"). Performance and payment bonds guarantee that the contractor will properly perform its contract and pay its subcontractors. *See Hartford Fire Ins. Co. v. United States*, 108 Fed. Cl. 525, 531 (2012) ("A surety bond

4

is a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third party obligee."). In 2009, LTC and its affiliates (as the principal obligors) began obtaining surety bonds from ICSP (the surety) for a series of construction contracts with United States Government entities (the obligees), including the Department of Defense ("DoD").

BMO Harris Bank N.A. ("BMO"), the Appellee here, provided credit to LTC and its affiliates pursuant to a May 2013 agreement that granted BMO security interests in most of the Debtors' property. In September 2014, the Bankruptcy Court entered an order approving a Memorandum of Understanding ("MOU") between BMO and the Trustee. The MOU acknowledged that BMO has first-priority security interests in certain federal tax refunds of the Debtors, including the Tax Refund at issue in this appeal (as defined further below).

## B.    The NPCC Contract, Breach, and Tender Agreement

Just one of the ICSP-bonded contracts is relevant to this appeal. In March 2012, LTC entered into a contract with the United States to construct the National Police Command Center in Afghanistan (the "NPCC Contract"). The contract price was approximately $55 million. Shortly thereafter, LTC executed a performance bond and payment bond, with ICSP as surety, for the NPCC Contract.[1]

---

[1] Another ICSP-bonded contract, for the construction of the Al Dhafra Air Base in the United Arab Emirates, was also at issue

5

In January 2014, the United States terminated LTC's right to proceed under the NPCC Contract due to default. The United States then demanded that ICSP perform its suretyship obligations pursuant to the bonds for the NPCC Contract. A performance bond surety (like ICSP) generally may satisfy its obligation to the government on a defaulted contract in a number of ways, including "taking over and completing performance" or "assuming liability for the government's costs in completing the contract which are in excess of the contract price." *Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1370 (Fed. Cir. 2001).

To satisfy its obligations here, ICSP entered into an August 2014 contract (the "Tender Agreement") with the United States and a new contractor, Macro Vantage Levant JLT ("MVL"), to complete the unfinished work under the NPCC Contract. MVL agreed to finish the construction work, and ICSP agreed to pay any "excess costs" for that performance — meaning any amount due beyond the funds that the United States had set aside based on the original contract price for the NPCC Contract. The Tender Agreement expressly provided that the "Surety's [ICSP's] bonds shall

in the Bankruptcy Court and the District Court proceedings. ICSP has forfeited any arguments that it might have regarding the Al Dhafra contract, as ICSP's briefs do not make any reference to that contract, let alone any arguments regarding its significance. *See In re Wettach*, 811 F.3d 99, 115 (3d Cir. 2016) (holding that arguments not developed in an appellant's opening brief are forfeited).

remain in force and effect during the performance of Work by [MVL] up to the complete expenditure of the penal sum of the Performance Bond." A364.

## C. Timing of Payments and Construction under the Tender Agreement

From October 2014 through September 2016, ICSP paid over $12 million to MVL to complete the NPCC. On December 26, 2015, the United States sent MVL a "Letter of Substantial Completion" for the NPCC facility. The letter explained that "construction progress is sufficiently complete to allow the Government use and possession of the facility effective **December 26, 2015**." A382 (emphasis in original). ICSP made the final three payments, of over $600,000 each, on July 25, August 18, and September 7, 2016. After the penultimate payment, on August 24, 2016, the United States sent MVL a letter that stated: "As a result of the final inspection conducted February 10, 2016, it has been determined that your construction progress is sufficiently complete to allow the Government use and occupancy of the facility effective **February 11, 2016**." A389 (emphasis in original). The letter "release[d] the surety [ICSP] from all further liability and responsibility." *Id.*

## D. The Bankruptcy Petition and the Tax Refund

Separately, on May 2, 2014, the Debtors filed voluntary Chapter 7 bankruptcy petitions. Shortly before doing so, in April 2014, they filed a consolidated federal tax return for

7

2013. The return showed net operating losses for 2013 and sought a "carryback" refund of approximately $5.5 million in federal income taxes that one or more of the Debtors had paid in 2011 (the "Tax Refund").[2] Because the Debtors had defaulted on many United States contracts, including the NPCC Contract, the United States placed a hold on payment of the Tax Refund, asserting the right to set off the $5.5 million against losses caused by the Debtors.

### E. The United States' and the Debtors' Bankruptcy Claims

On October 28, 2014, the United States filed, in the Debtors' bankruptcy proceedings, a summary proof of claim against the Debtors for a total of approximately $222 million (the "USPOC"). The USPOC included an $84 million "DoD Surety Claim," which consisted of contingent claims "related to Debtors' breach of contracts resulting in a surety . . . attempting to complete numerous DoD contracts," including

---

[2] The parties dispute whether LTC or one of its affiliates is the legal owner of the Tax Refund. We agree with the determinations of both the Bankruptcy Court and the District Court that there is a genuine dispute of material fact regarding ownership of the Tax Refund, but that resolution of the dispute is unnecessary here. It would be relevant only if ICSP held a right to set off the Tax Refund. *See generally In re Orexigen Therapeutics, Inc.*, 990 F.3d 748, 752–54 (3d Cir. 2021) (discussing the requirement of "mutuality" under federal bankruptcy law's setoff provision, 11 U.S.C. § 553).

the NPCC Contract.  A100.  The NPCC Contract claim was contingent on whether ICSP and MVL "fail to complete the [NPCC] Contract via the Tender Agreement."  A156.  The United States "expressly reserv[ed] its rights, pursuant to 11 U.S.C. § 553, to offset any prepetition obligation of the [United States] . . . against any portion of this claim."  A102.  The United States amended the USPOC on May 24, 2016, reducing the total claim to $170 million.  The amendment stated that $84 million of the total claim still stemmed from the DoD Surety Claim, which remained "contingent upon the completion of certain contracts by the Debtors' sureties."  A636.

As for the Debtors, they were also engaged in the litigation of various claims against the United States.  Most of those claims were for allegedly unpaid invoices on certain contracts (the "Requests for Equitable Adjustments" or "REAs").  The bankruptcy Trustee testified that the REAs had a face value of over $50 million.

### F.    The Settlement Stipulation and ICSP's Objection

In January 2016, the Trustee and the United States reached a comprehensive proposed settlement of all of the claims between the United States and the Debtors (the "Settlement Stipulation").  Among other things, the Settlement Stipulation provided that: (1) the United States would release the full amount of the Tax Refund to the Trustee, and the United States would waive its setoff rights against the Debtors; (2) the USPOC would be allowed as filed and the United States would have a non-priority general unsecured claim of

9

approximately $222 million (the claim was later reduced to approximately $170 million per the amended USPOC); and (3) the Debtors would dismiss, with prejudice, most of their pending litigation against the United States, including the litigation of the REAs. The Settlement Stipulation said nothing about subrogation rights.

Paragraph 4 of the Settlement Stipulation contained the United States' waiver of its setoff rights, including any right to set off the Tax Refund. The "Effective Date" of the waiver was defined as the "first business day after the Bankruptcy Court enters an order approving this Stipulation." A289. Paragraph 4 stated that the United States

> shall be deemed to expressly waive any setoff rights arising out of the [USPOC] that they may have or ever had pursuant to 11 U.S.C. § 553, and shall be estopped from claiming any such setoff rights it may have or ever had pursuant to 11 U.S.C. § 553, against any of the Debtors in and to the Tax Refund.

*Id.*

ICSP filed an objection to the Settlement Stipulation, arguing that it should not "be construed to release or impair rights or claims *belonging to ICSP*, based upon ICSP's existing rights as subrogee." A529 (emphasis in original). ICSP proposed "that the Stipulation be approved without prejudice to ICSP's subrogation rights, **if any**, and that any payment of the Tax Refund be held" in escrow pending adjudication of

10

ICSP's rights. A538 (emphasis added). In March 2016, the Bankruptcy Court held a hearing on the proposed settlement and then referred all relevant parties, including the Trustee, the United States, ICSP, and BMO (the first lien creditor), to mediation.

### G. The Settlement Order

On June 9, 2016, after mediation and negotiation, counsel for the Trustee informed the Bankruptcy Court that the parties had resolved ICSP's objection and agreed to a proposed order, which the Bankruptcy Court entered on June 28, 2016 (the "Settlement Order"). The Settlement Order attached and approved the terms of the original Settlement Stipulation "except as set forth" in the order. A277. The key provisions of the Settlement Order provide:

> 3. Except as provided in paragraph 5, nothing in this Order or the Stipulation shall waive, estop, or otherwise limit the rights of any party claiming an interest in the Tax Refund, including but not limited to, the estate, the Insurance Company of the State of Pennsylvania, BMO Harris Bank N.A., or any other party claiming an interest in the Tax Refund, and the parties reserve any and all rights and arguments they had regarding the ownership of, or their interest in [the] Tax Refund prior to the entry of this Order. . . .

11

5. Upon receipt of the Tax Refund, the Trustee shall hold the funds in escrow and shall make no distribution pending further Order of the Court [except to pay the Trustee's fees and pay the estates 10% of the Tax Refund, net of the Trustee's expenses].

A277–78.

## H. The Adversary Proceedings

In July 2016, the Trustee commenced an adversary proceeding against ICSP, seeking a declaratory judgment that the Debtors' estates were entitled to the entire $5.5 million Tax Refund. ICSP filed an answer and counterclaims, joining BMO as an additional counterclaim defendant and seeking a declaratory judgment that ICSP was entitled to the Tax Refund. BMO and ICSP both moved for summary judgment on the Tax Refund claims.

The Bankruptcy Court granted summary judgment to BMO and denied ICSP's motion for summary judgment on the Tax Refund claims. *See In re LTC Holdings, Inc.*, 597 B.R. 565, 567 (Bankr. D. Del. 2019).[3] The Bankruptcy Court determined that, when the Settlement Order was entered in

---

[3] The remaining claims in the consolidated adversary proceeding, which were unrelated to the Tax Refund, were later dismissed pursuant to a separate settlement approved by the Bankruptcy Court.

12

June 2016, the United States had not yet been "paid in full" under 11 U.S.C. § 509(c). ICSP's subrogation rights therefore remained subordinate, and the United States was entitled to waive its right to set off the Tax Refund in order to settle its remaining and superior claim. The Bankruptcy Court then concluded that the United States' waiver extinguished ICSP's ability to be subrogated to the setoff rights.

ICSP appealed to the District Court, which affirmed on essentially the same grounds set forth by the Bankruptcy Court in its ruling. *See In re LTC Holdings, Inc.*, No. 1-19-cv-00327, 2020 WL 5576850, at *1 (D. Del. Sept. 17, 2020). This timely appeal ensued.

## II. JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Court had jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. The District Court had jurisdiction pursuant to 28 U.S.C. § 158(a)(1). This Court has appellate jurisdiction under 28 U.S.C. §§ 158(d)(1) and 1291. *See In re Prof'l Ins. Mgmt.*, 285 F.3d 268, 278–81 (3d Cir. 2002).

"In this appeal, we stand in the shoes of the District Court and review the Bankruptcy Court's decision." *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 209 (3d Cir. 2011) (quotation marks and citations omitted). Thus, "we review the Bankruptcy Court's orders applying the standard it was appropriate for the District Court to apply." *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 97 (3d Cir. 2008). A bankruptcy court's order granting summary judgment is reviewed de novo. *See In re SemCrude L.P.*, 864 F.3d 280, 290 (3d Cir. 2017).

13

Summary judgment "is proper when, viewing the evidence in the light most favorable to the opposing party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (cleaned up).

When a bankruptcy court has analyzed one of its own orders, "an appellate court must distinguish between the review of a bankruptcy court's application of legal principles and the review of a bankruptcy court's actual interpretation of an ambiguous provision in its own order." *In re Shenango Grp. Inc.*, 501 F.3d 338, 346 (3d Cir. 2007). The application of legal principles to an unambiguous provision is reviewed de novo, whereas the interpretation of an ambiguous provision is reviewed for abuse of discretion. *Id.* The initial determination of whether a provision is ambiguous is reviewed de novo. *Id.* Here, we agree with the parties that the relevant provisions of the Settlement Order are "unambiguous." Appellant's Br. 30–31; Appellee's Br. 23. Thus, we exercise plenary review over the application of legal principles to those unambiguous provisions. *See Shenango*, 501 F.3d at 346.

## III. EQUITABLE SUBROGATION AND 11 U.S.C. § 509

### A. Subrogation at Common Law

Under the equitable common-law doctrine "generally known as the right of subrogation," a "surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 137 (1962). The right of equitable "[s]ubrogation is often called an equitable assignment or an

14

assignment by operation of law," as "[s]ubrogation does not spring from contract although it may be confirmed or qualified by contract." Restatement (Third) of Suretyship & Guaranty § 27 cmt. a (1996). Here, none of the relevant contracts speaks to the parties' subrogation rights, other than to broadly reserve those rights.

The common-law right of subrogation generally has two limitations that are relevant here. First, a subrogee takes no more rights than the subrogor had. *United States v. California*, 507 U.S. 746, 756 (1993). Thus, a subrogee "usually 'cannot acquire by subrogation'" rights that the subrogor did not have. *Id.* (citation omitted). Second, payment in full is typically required before rights are subrogated. *See generally LTC Holdings*, 597 B.R. at 574 n.47 (collecting cases).

A surety fulfilling an obligation under a performance bond for a government contract is subrogated "to the contractual rights of both the defaulted contractor and the government." *Hartford*, 108 Fed. Cl. at 532; *see also Universal Bonding Ins. Co. v. Gittens & Sprinkle Enters., Inc.*, 960 F.2d 366, 376 (3d Cir. 1992) (citing *Pearlman*, 371 U.S. at 132). Thus, the performing surety "is entitled to the funds in the hands of the government . . . as a subrogee having the same right to the funds as the government." *Hartford*, 108 Fed. Cl. at 532 (cleaned up). And "[t]he government has the same right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him." *United States v. Munsey Trust Co. of Wash., D.C.*, 332 U.S. 234, 239 (1947) (quotation marks and citation omitted). The Bankruptcy Code

15

generally preserves the right of a creditor to use funds in its possession to set off "a mutual debt ow[ed] by such creditor to the debtor . . . against a claim of such creditor against the debtor." 11 U.S.C. § 553(a).

### B.  Subrogation under the Bankruptcy Code, 11 U.S.C. § 509

Section 509 of the Bankruptcy Code "is the statutory enactment of the long-standing doctrine of equitable subrogation." *In re Chateaugay Corp.*, 89 F.3d 942, 947 (2d Cir. 1996) ("*Chateaugay I*"). The parties do not dispute the Bankruptcy Court's conclusion that application of Section 509 controls this case. *See LTC Holdings,* 597 B.R. at 573–74; *see also* 4 Collier on Bankruptcy ¶ 509.02 (16th ed. 2021) (noting that many courts "still apply common law standards in one form or another when conducting a section 509 analysis"). In relevant part, Section 509 provides:

> (a) Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment. . . .

> (c) The court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution, of an entity that is liable with the debtor on, or that

16

has secured, such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise.

11 U.S.C. § 509.

In a departure from the general common-law rule, Section 509(a) provides that a surety is partially subrogated to the rights of a creditor to the extent that the surety has made *any* payments (*i.e.*, short of payment in full). However, Section 509(c) provides that those subrogation rights are subordinated to the remainder of the creditor's claim until the creditor has been paid in full. Although resort to legislative history is unnecessary here to render any more plain Congress's intent in ordering how Section 509(c) should operate, portions of that history do explain congressional concern for preventing a surety from "compet[ing] with the creditor he has assured until the assured party's claim has [been] paid in full." 124 Cong. Rec. H. 11,094 (Sept. 28, 1978), S. 17,410–11 (Oct. 6, 1978); *see also Pa. Nat'l Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 951 (8th Cir. 2004) (explaining that the full performance requirement also encourages a surety to pay claims in full, rather than paying only to the extent that the surety anticipates a "dividend in the assets of the debtor").

17

# IV. ANALYSIS

### A. The United States was not "paid in full" when the Settlement Order was entered, so ICSP's rights were subordinate under Section 509(c).

We agree with the Bankruptcy Court's assessment that, under Section 509(c), the term "paid in full" is susceptible to either a "broad" or a "narrow" construction. *See LTC Holdings,* 597 B.R. at 574–75. And, like the Bankruptcy Court, we see no need to decide which of these constructions applies, as ICSP did not make payment "in full" under either construction.

#### 1. The broad construction of "paid in full"

Under the broad construction of "paid in full," a surety's full payment of the obligee's claims against the debtor under a single secured contract, standing alone, does not constitute payment "in full." Instead, to be "paid in full," the obligee must have received full payment for all its claims against the debtor, including claims stemming from other contracts. *See generally Hartford*, 108 Fed. Cl. at 532 (explaining that "[t]he set-off right applies to government claims both under other contracts and under the same contract").

Here, the USPOC asserted that the Debtors had caused the United States to suffer losses not only on the NPCC Contract, but also on many other contracts (some of which were bonded by ICSP, while others were not). The undisputed facts establish that the United States was not paid in full on

18

those other contract claims before the Settlement Order was entered. Thus, under the broad construction, regardless of whether ICSP had made payment in full on its suretyship obligations for the NPCC Contract, the United States was not "paid in full" before the Settlement Order was entered.

### 2. *The narrow construction of "paid in full"*

The narrow construction of "paid in full" is that a surety makes payment "in full" once it "pays in full the portion of the creditor's claim to which it stood as surety." 4 Collier on Bankruptcy ¶ 509.04 (citing *In re Tri-Union Dev. Corp.*, 314 B.R. 611 (Bankr. S.D. Tx. 2004)). "[T]he surety's subrogated claim is not subordinated to the remaining portion of the creditor's claim." *Id.* Here, under the narrow construction, the issue is whether ICSP had made payment in full on its suretyship obligations for the NPCC Contract before the Settlement Order was entered on June 28, 2016.

### a. ICSP had not yet paid its NPCC obligations "in full"

While there is limited authority on what constitutes payment in full, the "secondary authorities agree that to subrogate a claim, payment in the technical sense is not required." *Feldhahn v. Feldhahn*, 929 F.2d 1351, 1354 (8th Cir. 1991). Rather, "[w]hatever discharges the liability and is accepted as payment is sufficient." *Id.* (quoting 73 Am. Jur. 2d Subrogation § 29 (1974)); *see also Chateaugay I*, 89 F.3d at 948 (citing *Feldhahn*, 929 F.2d at 1354). And 11 U.S.C. § 509(c) provides that payment in full may be made "either

19

through payments under this title or otherwise." Again, in the context of defaulted government contracts, a surety generally meets its obligation by "taking over and completing performance," or "assuming liability for the government's costs in completing the contract which are in excess of the contract price." *Ins. Co. of the W.*, 243 F.3d at 1370. As discussed above, to satisfy its suretyship obligations here, ICSP arranged for MVL to complete the work on the NPCC facility, and ICSP agreed to cover the payment of the excess costs.

A reasonable factfinder could conclude that the United States was "paid in full" either when ICSP made the final payment to MVL on September 7, 2016, or when the United States sent the August 24, 2016 letter releasing ICSP from its suretyship obligations. But, as discussed below, there is no evidence in the record that would permit a reasonable factfinder to conclude that the United States was paid in full at any time before the June 28, 2016 Settlement Order was entered.[4] So ICSP had not made payment in full at that time, and its rights were subordinate to the United States' rights under Section 509(c).

---

[4] The Bankruptcy Court determined that "[f]urther discovery would not help ICSP" on this issue. *LTC Holdings,* 597 B.R. at 577. ICSP has forfeited any challenge to that ruling by failing to raise the issue in its briefing. *See Wettach*, 811 F.3d at 115.

20

b. ICSP's arguments that it had "paid in full" are unavailing

ICSP primarily argues that it completed its NPCC suretyship obligations on or about February 11, 2016, "when the physical work of the NPCC contract was completed." Appellant's Br. 42. ICSP correctly notes that the United States' August 24, 2016 letter released ICSP from its suretyship obligations and stated that, following an inspection conducted February 10, 2016, the "construction progress [was] *sufficiently complete* to allow the Government use and occupancy of the facility effective **February 11, 2016**." A389 (italic emphasis added). But, on its face, that statement does not indicate that the United States deemed ICSP's suretyship obligations "actually complete" in February 2016, especially when the statement is viewed in the context of the record here.

As the Bankruptcy Court emphasized, the uncompleted and unpaid work on the NPCC facility was the basis for the United States' contingent DoD Surety Claim. *See LTC Holdings*, 597 B.R. at 578. When the United States filed its amended USPOC on May 24, 2016, the United States declared that the DoD Surety Claim was still "contingent upon the completion" of the NPCC Contract pursuant to the Tender Agreement. A636. That is not surprising, as ICSP later made three payments to MVL on July 25, August 18, and September 7, 2016, each for over $600,000. Those payments, in conjunction with the fact that the United States did not explicitly release ICSP from its suretyship obligations until August 2016, preclude a reasonable factfinder from concluding that ICSP had made payment in full in February 2016.

21

ICSP further argues, in the alternative, that it "discharged its obligations to the United States under the NPCC Performance Bond by entering into the NPCC Tender Agreement" in August 2014. Appellant's Br. 40. It is true that, in some cases, a promise may "effectively discharge" a debt. *See Chateaugay I*, 89 F.3d at 948 (collecting cases). As the Bankruptcy Court explained, in those cases, the "understanding and behavior of both parties" indicate that the promise satisfies the debt. *LTC Holdings*, 597 B.R. at 577; *see also id.* (discussing *Feldhahn*, 929 F.2d at 1352, in which "the court treated the obligation as discharged because the bank cancelled the note it held for a divorced couple's debt after the non-debtor wife assigned it the proceeds from a contemplated real estate sale").

But here, based on the record and the text of the Tender Agreement, the agreement itself did not satisfy ICSP's suretyship obligations. The Tender Agreement provided that "[t]he Surety's bonds shall remain in force and effect during the performance of Work by [MVL] up to the complete expenditure of the penal sum of the Performance Bond." A364. Thus, the Tender Agreement merely set forth agreed-upon actions that, once taken, would satisfy ICSP's obligations. Again, the United States expressly indicated in its May 2016 amended USPOC that ICSP's suretyship obligations were not yet satisfied.

Relying on *In re Chateaugay Corp.*, 94 F.3d 772, 780 (2d Cir. 1996) ("*Chateaugay II*"), which is discussed in detail below, ICSP alternatively argues that the United States was

22

paid in full through its settlement with the Debtors. But even assuming that the provisions of the Settlement Stipulation could have paid the United States in full here, the Settlement Stipulation did not take effect until after the entry of the Settlement Order. And the Settlement Order reserved ICSP's rights as they existed "prior to the entry of this Order." A277. Thus, any "payment" to the United States in the Settlement Stipulation cannot be used to determine the status of ICSP's performance, and attendant subrogation rights, "prior to the entry" of the Settlement Order.

In its reply brief, ICSP further argues that, as of June 2016, it was merely withholding the final payment until the United States sent a letter accepting MVL's work. Specifically, ICSP argues that "it is neither unusual nor a contractual breach for a surety to withhold final payment to a completion contractor . . . until after a construction project's owner formally confirms its acceptance of the work in writing." Appellant's Reply Br. 9. We do not need to evaluate the legal merit of that argument, as it rests on a factual premise that is not supported by the record here. No evidence supports ICSP's view that, in June 2016, it was withholding only a final payment pending a letter from the United States accepting MVL's work. After the Settlement Order was entered in June 2016, ICSP made *three* aforementioned payments (each over $600,000) on July 25, August 18, and September 7, 2016. Only the September 7 payment was made after the United States sent the August 24, 2016 letter releasing ICSP from its suretyship obligations. Thus, no reasonable factfinder could conclude that either the July 25 or the August 18 payment was a "final

23

payment" that ICSP was withholding until the United States accepted MVL's work.

Therefore, we conclude both that the United States was not yet "paid in full," within the meaning of 11 U.S.C. § 509(c), prior to the entry of the Settlement Order on June 28, 2016, and that ICSP's subrogation rights were subordinate to the United States' remaining and superior claim at that time.

> **B.** **The United States was entitled to waive its right to set off the Tax Refund in order to settle its remaining and superior claim.**

We now turn to whether the United States was entitled to waive its setoff rights to settle its superior claim. We agree with the Bankruptcy Court's thorough analysis of this issue. *See LTC Holdings*, 597 B.R. at 575–78. The text and structure of Section 509, which subordinates a surety's partially subrogated claim "for the benefit of" the obligee, 11 U.S.C. § 509(c), make clear that the obligee may use its setoff rights to vindicate its own remaining interests.[5] Moreover, we agree

---

[5] Our holding is limited to cases where, as here, the surety has not "paid in full" the portion of the obligee's claim to which it stood as surety. Because we resolve this issue under that "narrow" construction of Section 509(c), we do not address the broader issue of how an obligee may use its setoff rights to vindicate its own remaining interests on other claims against the debtor once a surety has made payment in full on the portion of the obligee's claim to which it stood as surety.

24

with the Second Circuit's conclusion in *Chateaugay II* that an obligee may waive its setoff rights even after a surety has made payments that would confer subrogation rights under Section 509. *See* 94 F.3d at 776 (concluding that a surety was subrogated to the government's right to set off a tax refund because the government had not waived the right, but explaining that "if the [government had] waived its right of setoff then [the surety] would have no interest in the refund").

On appeal, as in the Bankruptcy Court proceedings, "ICSP has not cited anything that bars the United States from releasing its setoff rights" under the circumstances here. *LTC Holdings*, 597 B.R. at 575. Thus, we agree with the Bankruptcy Court's conclusion that Section 509(c) "places the surety in line behind the obligee, who may exhaust the funds to satisfy his own claim." *Id.* Instead of contesting this point, ICSP has primarily argued that the United States' waiver did not extinguish the rights that ICSP reserved in the Settlement Order. We will now address whether the waiver extinguished ICSP's ability to be subrogated to the setoff rights.

**C. The United States' waiver extinguished ICSP's ability to be subrogated to the setoff rights.**

As a subrogee, ICSP can assume no more rights than those that belonged to its subrogor. *See California*, 507 U.S. at 756. Thus, ICSP "'cannot acquire by subrogation'" the setoff rights that the United States has waived. *Id.* (citation omitted); *see also Chateaugay II*, 94 F.3d at 776. ICSP raises two arguments to the contrary, but neither is persuasive. First, ICSP argues that the reservation of rights in the Settlement

25

Order limited the effect of the United States' waiver here. Second, ICSP argues that the Second Circuit's reasoning in *Chateaugay II* supports ICSP's claim to the setoff rights.

1.  *Effect of the Settlement Order*

Again, the relevant provision of the Settlement Order provides:

> . . . nothing in this Order or the Stipulation shall waive, estop, or otherwise limit the rights of any party claiming an interest in the Tax Refund, including but not limited to, the estate, the Insurance Company of the State of Pennsylvania, BMO Harris Bank N.A., or any other party claiming an interest in the Tax Refund, and the parties reserve any and all rights and arguments they had regarding the ownership of, or their interest in [the] Tax Refund prior to the entry of this Order.

A277. ICSP argues that it was subrogated to the United States' setoff rights to the extent that ICSP had made payments, that the above-quoted language reserved those rights, and that absolutely "nothing" the United States did in the Settlement Stipulation (*i.e.*, the waiver) could alter those rights. Appellant's Br. 31.

However, the Settlement Order does not define the nature of the rights that ICSP reserved. Rather, ICSP reserved "any and all rights and arguments," if any, "regarding the

26

ownership of, or [its] interest in [the] Tax Refund prior to the entry of this Order." A277. As discussed above, prior to the entry of the Settlement Order, ICSP had not made payment in full to the United States. Thus, at the time that ICSP reserved its subrogation rights, those rights were subordinate to the United States' ability to use the setoff rights to settle its remaining and superior claim. The Settlement Order did not transform or redefine the nature of ICSP's subordinate rights. Again, those subordinate rights were extinguished once the United States waived them, which ICSP consented to rather than pressing its objection.

ICSP argues that this interpretation of the Settlement Order renders it "meaningless" or worthless for ICSP. Appellant's Br. 35. Yet BMO would have at least an equally strong argument that the Settlement Order and Settlement Stipulation would be worthless for the Trustee (and BMO) if we were to determine that the United States' waiver did not extinguish ICSP's rights. As BMO argues, "the Settlement Stipulation was built around the setoff release," and the "Trustee would not have released the estates' REA claims against the United States, or agreed to the allowance of the DOD Claim, in the absence of the setoff release." Appellee's Br. 25. In point of fact, the Settlement Order was not worthless for ICSP, as ICSP obtained at least two clear benefits. First, ICSP effectively preserved its subrogation arguments (including the argument that ICSP had made payment in full). BMO has not attempted to preclude ICSP from arguing its ownership of the Tax Refund on the basis of waiver or estoppel. Second, the Settlement Order ensured that the United States would relinquish the $5.5 million Tax Refund into

27

escrow (rather than attempting to set off the Tax Refund against the United States' own losses acknowledged in the Settlement Stipulation).  This at least guaranteed that ICSP would get a bite at the $5.5 million apple.

2.      *Relevance of Chateaugay II*

ICSP argues that a ruling against its claim to the Tax Refund is inconsistent with *Chateaugay II*. *See* 94 F.3d at 773–80.  Of course, that authority from the Second Circuit is not binding on this Court.  It is also distinguishable in several key ways.

The procedural history of *Chateaugay II* was tangled.  A mining company (LTV Steel, the debtor) had obtained surety bonds from Aetna (the surety) in favor of the United States Department of Labor (DOL, the obligee) for certain black lung benefits owed to the company's employees.  *Id.* at 773–74.  When the debtor filed for Chapter 11 bankruptcy and stopped paying the black lung benefits, the surety paid out the full $5.5 million owed under its bond.  *Id.* at 774.  The DOL then paid the remainder of the benefits due.  *Id.*

In an earlier proceeding, the debtor and the DOL had reached a settlement wherein the debtor agreed to pay back a portion of the black lung benefits that the DOL had been forced to cover.  The surety pressed an objection that the DOL settlement risked extinguishing the surety's right to be repaid as a subrogee to the DOL.  *Id.*  The Second Circuit explained that it had affirmed the DOL settlement "but expressly noted

28

that the settlement could have no adverse effect on [the surety's] rights or claims." *Id.*

*Chateaugay II* stemmed from the IRS's proposed settlement with the debtor regarding certain tax payments. That settlement indicated that the federal government owed a tax refund to the debtor; the IRS planned to set off the refund against certain excise taxes that were owed by the debtor. *Id.* at 775. Apparently, that tax refund was not mentioned in the earlier DOL settlement, as the surety first learned of the tax refund when it received the application to approve the IRS settlement. *Id.* The surety sought to prohibit the IRS from using the refund and/or to obtain adequate protection for its interest in the refund as a subrogee to the DOL. *Id.* The Second Circuit held, among other things, that the DOL had been "paid in full" and that the surety had an interest in the tax refund because it was subrogated to the DOL's setoff rights. *Id.* at 780, 782.

In summary, the surety in *Chateaugay II*: (i) had made payment in full; (ii) pressed an objection to a settlement that apparently had no mention, let alone an express waiver, of the government-obligee's right to set off a tax refund; and (iii) obtained a court order that the settlement could "have no adverse effect" on the surety's subrogation rights.

In contrast, here, ICSP: (i) had not made payment in full; (ii) dropped its objection to a settlement that had an express waiver of the government-obligee's setoff rights, including the right to set off the Tax Refund; and (iii) obtained a court order reserving only the undefined "rights and

29

arguments" that ICSP had, if any, to set off the Tax Refund prior to the entry of the Settlement Order. Again, because ICSP had not made payment in full, the subrogation rights that ICSP held at the time of the Settlement Order were subordinate to the United States' rights. Thus, the United States was entitled to, and did, waive its setoff rights to settle its own remaining and superior claim. That waiver extinguished ICSP's derivative subrogation rights to set off the Tax Refund.

## V. CONCLUSION

For the foregoing reasons, we conclude that the United States was not yet paid "in full" when the Bankruptcy Court approved the Settlement Order. Thus, pursuant to Section 509(c), ICSP's subrogation rights were subordinate to the United States' remaining and superior claim at the time of the settlement. The United States was therefore entitled to waive its setoff rights to satisfy its own claim, and the waiver extinguished ICSP's ability to be subrogated to those rights. Accordingly, we will affirm the order of the District Court affirming the Bankruptcy Court's ruling that ICSP is not entitled to the Tax Refund.

30